In re **FERNANDES SUPERMARKETS, INC.,** Debtor.

**FERNANDES SUPERMARKETS, INC.,** Plaintiff,

v.

**Richard R. VAZZA, Trustee of Park West Trust,** Defendant.

**Bankruptcy No. 78–1713–HL.**

United States Bankruptcy Court, D. Massachusetts.

Oct. 25, 1979.

Charles R. Bennett, Jr., Riemer & Braunstein, Boston, Mass., for plaintiff, Fernandes Supermarkets.

Marcus E. Cohn, Frank Giso, III, Peabody, Brown, Rowley & Storey, Boston, Mass., for defendant, Park West Trust.

## MEMORANDUM RE LANDLORD'S DAMAGES

HAROLD LAVIEN, Bankruptcy Judge.

The debtor, Fernandes Supermarkets, Inc., has objected to a proof of claim filed by the debtor's former landlord seeking damages for breach of a lease agreement by the debtor. The parties have stipulated as to the amounts due for pre-filing unpaid rent and for the administrative claim for use and occupation.

The lease in question was executed by Park West Trust as lessor and the debtor as lessee on November 10, 1972 for a term of 25 years commencing in August, 1973. The premises were surrendered by the debtor on February 2, 1979 and were re-let under a percentage lease on February 27, 1979 to the Newton Buying Corporation which operates a discount clothing store, T. J. Maxx (hereinafter referred to as T. J. Maxx). The debtor filed a petition for an arrangement under Chapter XI on September 12, 1978 and a plan was confirmed on April 9, 1979.

The lessor claims damages of $288,718 for loss of rental income, $25,000 allowance for remodeling and alterations by the new tenant, $6,394.15 for repairs to the premises, and $1,900 for attorneys' fees incurred for negotiations with the new tenant. Because section 353 of the Bankruptcy Act, 11 U.S.C. § 753, limits à claim for damages to an amount not to exceed the amount of rent reserved in the lease for the three years following surrender of the premises, the parties have agreed that the maximum damages recoverable for the alleged breach is $247,230.96.

The rent reserved in the lease, which is a net rent placing the obligation for taxes, insurance, and common area maintenance expenses on the tenant, is $57,282.00 per annum, or $2.10 net rent per square foot. The gross rent, including the tenant's obligation for taxes, insurance, and common area maintenance expenses, is $82,689.30 per annum, or $3.03 gross rent per square foot. The parties agree that the remaining rental term is 19 years, 11 months and that a ten percent capitalization factor of 8.624367 is applicable to obtain present value. The parties stipulated that the only issue was the measure of damages.

■ The applicable law to determine the measure of damages for breach of a lease agreement is the difference between the present lease value for the remainder of the term and the present fair rental value for the remainder of the term. *See, City Bank Co. v. Irving Trust Co.*, 299 U.S. 433, 443, 57 S.Ct. 292, 81 L.Ed. 324 (1937); *Kuehner v. Irving Trust Co.*, 85 F.2d 35, 37 (2d Cir. 1936), *aff'd*, 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340 (1937); *A & S Prods. Corp. v. Parker*, 334 Mass. 189, 192, 134 N.E.2d 449, 451 (1956).

At trial, the lessor's expert testified to a fair rental value of $1.81 gross rent per square foot, or $49,371.37 per annum. Deduction of sums for taxes, insurance, and common area maintenance expense, would reduce the net rent figure to $23,964.07 per annum, or $.88 net rent per square foot. The expert's explanation for the diminution in rental value from $2.10 net rent per square foot (which would be the presumed fair rental value) to $.88 net rent per square foot, rested to an extent upon the nearby location and greater size of the Westgate Shopping Mall. This condition, however, has remained substantially unchanged since November, 1972, the time at which the parties hereto executed the lease agreement. The expert further cited as significant changes in conditions the closing of Mammoth Mart, a so-called "anchor tenant" of the shopping center in 1977. This store was re-let to Supermarkets General Corporation which operated a discount catalog show-

room under the name Value House (hereinafter referred to as Value House). There was no evidence indicating that this new tenant was any less a desirable store than was Mammoth Mart. The rent reserved in the Value House lease equalled $2.21 net rent per square foot. The Value House lease also contained new and extensive restrictions on the use of space on a re-letting by other tenants in the shopping center which would affect re-leasing of the other stores. The lessor's expert relied heavily on these restrictions in explicating the diminished fair rental value of the subject property in that the restrictions severely limited the uses for which the property could be leased. The expert concluded that in light of these restrictions the landlord made the best of his handicapped position by renting the space to the retail clothing store on a percentage basis. The expert then extrapolated the fair rental value by utilizing the rental amounts for the first three months of the T. J. Maxx operation without making allowances for the difficulties in start-up or the anticipated potential improvement. He then supports his figures by reference to "comparable" properties, some of which are doubtful as comparables. All of the so-called "comparables" had higher rental figures than the $.88 net rent per square foot assigned to the subject property—a fact which the expert explained to be the result of the "comparables" being superior to the subject property.

One of the lessor's principals testified, in contradiction of his expert, that the restrictions in the Value House lease did not affect the fair rental value which he valued at $1.75 gross rent per square foot, or $47,734.75 per annum. Reducing this figure by the agreed upon amounts for taxes, insurance, and common area maintenance expenses yields a net rental amount of $22,285.45 per annum, or $.82 net rent per square foot.

The debtor's expert testified that there was no diminution in value and that the fair rental value of the subject property remained at $2.10 net rent per square foot, but he further testified that he was un-

aware of the restrictions in the Value House lease. After examining the restrictions while on the witness stand, the debtor's expert stated that he considered the restrictions irrelevant because he based his opinion on his general knowledge of the area and on the rent being paid by supermarket food chains in the area.

The court considered all of the evidence, including the heavy reliance by the landlord's expert on the actual lease to the subsequent lessee, which was not only admittedly irrelevant,[1] but even factually unreliable because of its percentage nature and inadequate duration of operation from which to draw a realistic projection at the time of the study. Further, the court has considered the expert's strong opinion as to diminution of value as a result of the restrictions in the Value House lease which the landlord voluntarily created during the term of the debtor's lease and without any participation by the debtor. The diminution was created by the landlord for its own benefit and should not be totally charged against the debtor. The testimony of the lessor's principal conflicted with its own expert and has of course a selfserving nature. The court also weighed the presumed fair rental value of the original lease, see, In re Millard's, Inc., 41 F.2d 498, 499 (7th Cir. 1930); In re Vescio's, Inc., 2 Bankr.Ct. Dec. 1015, 1017 (E.D.Mich.1976), and the testimony of the debtor's expert, whose evaluation of the neighborhood appeared to be more in keeping with the actual concentration of residences, proximity of highways, and the traffic generated by the other religious, recreational and shopping facilities in the area.

Upon consideration of all the evidence presented, I find the fair rental value to be $1.85 net rent per square foot, or $50,462.45 per annum.

Turning to the propriety of the additional claims made by Park West Trust for expenses incurred in obtaining a new tenant and in preparing the subject premises for the subsequent lessee, Park West claims that it should be compensated for $6,349.15 expended to eliminate fixtures left on the premises by the debtor after surrender, $25,000 for funds expended for tenant improvements purportedly necessary to attract a new tenant, and $1,900 in attorneys' fees incurred in negotiations with the new tenant. The parties agree in their briefs that the controlling law is the law of Massachusetts. In Perry v. Wilson Bros., Inc., 260 Mass. 519, 157 N.E. 579 (1927), the Massachusetts Supreme Judicial Court held that the

> . . . expense of changes and alterations reasonably necessary in order to obtain or to retain an occupant at a proper rent may be charged to the original lessee . . . [b]ut a change so substantial [installation of a new store front] goes beyond the line of proper charges . . . [t]he change was a permanent alteration in the building resulting in benefit to the owner rather than a repair or temporary alteration for a tenant's use.

Id. at 522, 157 N.E. at 580. Accord, In re Parkview-Gem, Inc., 465 F.Supp. 629, 636–38 (W.D.Mo.1979).

At trial, Park West introduced evidence that $6,349.15 was expended to remove certain freezer units, repair the roof, and clean the subject premises. Under Massachusetts law, these expenses are properly included in damages assessed against the breaching tenant. Park West introduced the T. J. Maxx lease regarding the $25,000 payment by Park West to the subsequent lessee, T. J. Maxx. The lease agreement between Park West Trust and T. J. Maxx provides that the lessor is to pay $25,000 to the tenant for alterations that the tenant may or may not make.[2] There

---

1. "Testimony as to present rental value partakes largely of the character of prophesy . . . ." Kuehner v. Irving Trust Co., 299 U.S. 445, 454, 57 S.Ct. 298, 302, 81 L.Ed. 340 (1937).

2. Article III, 3.3 of the lease provides:
   3.3 On or before the Commencement Date Landlord shall pay to Tenant, as a contribution to the cost to Tenant of performing the work described in Section 3.2, the sum of Fifteen

was no evidence of the nature and extent of such alterations. Without such evidence this court cannot determine their propriety. *See, In re Parkview-Gem, Inc.*, 465 F.Supp. 629 (W.D.Mo.1979). Indeed, without evidence that alterations were actually made, the lease provision regarding the payment of $25,000 may even constitute a method of recouping a reduction in rent. Park West has failed to meet its burden of proof on this matter, and therefore the $25,000 claim is disallowed.

Park West also seeks compensation for attorneys' fees incurred in negotiating the lease with the subsequent lessee. Inasmuch as this is an appropriate charge resulting from the debtor's breach and is also provided for in Article 15 of the lease agreement between the debtor and the lessor, the claim is allowed.

In accordance with the foregoing, it is hereby ordered that Park West Trust be allowed an unsecured claim in the amount of $73,100.14. The damages are calculated by determining the difference between the fair rental value for the remainder of the term and the rent reserved for the remainder of the term agreed to be 19 years 11 months reduced to present value by utilizing an agreed 10% capitalization which results in a lost rental value of $58,811.71 and adding the additional claims for repairs in the amount of $6,349.15, attorneys' fees in the amount of $1,900, and the agreed upon pre-filing claim of $6,039.28. *See, In re Aristo Foods, Inc.*, 1 Bankr.Ct.Dec. 345, 350 (W.D.Miss.1974). There is also the stipulated administrative charge for use and occupation in the amount of $1,883.24.

```
rent reserved:      $2.10 net rent per square foot
fair rental value:   1.85 net rent per square foot
                      .25 net rent per square foot

                  27,277 square feet
               x     .25 net rent per square foot
                   6,819.25

                   6,819.25
               x  8.624367  capitalization factor
                 $58,811.71  lost rental value
```

Thousand Dollars ($15,000), and on or before the ninetieth (90th) day thereafter Landlord shall pay to Tenant the sum of Ten Thousand Dollars ($10,000).

Article III, 3.2 of the lease provides in pertinent part:

```
$58,811.71   lost rental value
 6,039.28    stipulated charges
             (pre-filing claim)
 6,349.15    repairs
 1,900.00    attorneys' fees
$73,100.14
```

Tenant shall have the right . . . to make such improvements thereto as it shall have the right to make and install therein fixtures, supplies, merchandise and other property. . .